FILED

JUN 28 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Netflix, Inc. Securities Litigation | No. C04-2978 FMS |
| | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| This document relates to: | |
| ALL CASES | |

INTRODUCTION

This is a securities action that comes before the Court on the defendants' motion to dismiss plaintiffs' Consolidated Complaint and plaintiffs' motion to strike certain exhibits submitted in support of defendants' motion. Having considered the arguments of the parties, the Court DENIES plaintiffs' motion to strike and GRANTS defendants' motion to dismiss.

BACKGROUND

Netflix, Inc. ("Netflix" or "the Company"), a Delaware corporation with its principal place of business in Los Gatos, California, is an online movie rental subscription service. Individual Defendants Reed Hastings, Barry McCarthy, and Leslie J. Kilgore are citizens and residents of California, and respectively hold the positions of Chief Executive Officer, Chief Financial Officer, and Chief Marketing Officer at Netflix. Plaintiffs purchased publicly-traded

securities of Netflix and allege damage thereby.

Plaintiffs claim that the defendants caused the Company's shares to trade at artificially inflated levels by issuing false and misleading statements and by failing to disclose specific material facts required to render Netflix's statements not misleading in the time period between October 1, 2003 and October 14, 2004 (the "Class Period"). The allegedly false and misleading statements concerned the Company's rate of "churn," a metric relating to loss of subscribers; the Company's improving service and growth; the Company's competition; and the Company's relationship with TIVO, Inc.

The primary allegation concerns the Company's statements about its churn rate and subscriber cancellations. Plaintiffs allege that the manner in which Netflix calculated churn was improper. Netflix calculated churn by dividing subscriber cancellations by the sum of subscribers at the beginning of the quarter plus gross subscriber additions during the quarter, and then dividing by three months. Plaintiffs contend that "actual churn" is calculated by dividing subscriber cancellations by the average number of customers during the quarter (the sum of subscribers at the beginning and subscribers at the end, divided by two), and then dividing by three months. Plaintiffs contend that Netflix's manner of calculating churn overemphasized subscriber additions and eliminated the effect of subscriber cancellations.

Defendants argue, however, that there is no "official way" to calculate churn, and that there were no false or misleading statements with respect to churn and subscriber cancellations. They state that the method of calculating churn was explained in a footnote on each quarterly report. Netflix also argues that although the number of subscriber cancellations was not included in the financial reports before July 15, 2004, this number could be calculated for each quarter using the numbers that were included in each quarter's financial reports (the number of subscribers at the beginning and end of each quarter, new subscriber additions, and the churn rate).

During the Class Period, Netflix issued financial results for the third quarter of 2003, the fourth quarter of 2003, the first quarter of 2004, the second quarter of 2004, and the third quarter of 2004. The reports contained the following information, in relevant part:

2

      On October 15, 2003, the Company reported that it ended the third quarter of 2003 with a total of 1,291,000 subscribers, increasing from a total of 1,147,000 subscribers at the end of the second quarter of 2003. The Company also reported that it had acquired 282,000 new trial customers and that the churn rate was 5.2%. (Ex. R)

      On January 21, 2004, the Company reported that it ended the fourth quarter of 2003 with a total of 1,487,000 subscribers. The Company also reported that it had acquired 444,000 new trial customers and that the churn rate was 4.8%. (Ex. S)

      On April 15, 2004, the Company reported that it ended the first quarter of 2004 with a total of 1,932,000 subscribers. The Company also reported that it had acquired 760,000 new trial customers and that the churn rate was 4.7%. (Ex. T)

      On July 15, 2004, the Company reported that it ended the second quarter of 2004 with a total of 2,093,000 subscribers. The Company also reported that it had acquired 583,000 new trial customers and that the churn rate was 5.6%. In this report, the Company also provided data about subscriber cancellations that had not been provided in other reports. It reported 422,000 subscriber cancellations in the second quarter of 2004; 315,000 subscriber cancellations in the first quarter of 2004; and 232,000 subscriber cancellations in the second quarter of 2003. (Ex. U)

      On October 14, 2004, the Company reported that it ended the third quarter with a total of 2,229,000 subscribers. The Company also reported that it had acquired 590,000 new trial customers and that the churn rate was 5.6%. The company also reported 454,000 subscriber cancellations during the quarter. (Ex. X)

On July 16, 2004, the day after the company issued its financial results for the second quarter of 2004, the share price of Netflix fell $8.98 per share, or 28.6%, to close at $23.02 per share. Subsequent to the July 15 announcement and July 16 stock price decline, various Netflix shareholders filed securities class action lawsuits alleging that Netflix and a number of its executives violated federal securities laws by failing to disclose the potential adverse effects of subscriber cancellations and by manipulating the calculation of customer churn.

On August 13, 2004, a shareholder filed a purported derivative suit in this Court asserting claims for breach of fiduciary duty, insider trading, and contribution and indemnification. *Mitzner v. Hastings*, C04-3310 FMS. On January 14, 2005, the Court dismissed the Mitzner complaint for failure to show that demand on Netflix's Board was excused. Plaintiff did not take the opportunity it was given to amend its complaint, and the Court dismissed the action with prejudice on February 23, 2005.

By an Order of this Court on January 11, 2005, a group of plaintiffs was appointed as lead plaintiff for the securities class action lawsuits against Netflix and directed to file a Consolidated Complaint by February 25, 2005. Plaintiffs timely filed their Consolidated Complaint alleging

violations of § 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) and 15 U.S.C. § 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants timely filed the instant motion to dismiss.

LEGAL STANDARDS

A. Rule 12(b)(6)

In considering a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6), the court must take the material allegations of the complaint as true and construe them in the light most favorable to plaintiff. *See Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). The court should dismiss a cause of action only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court, however, is "not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

The Ninth Circuit has held that leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts." *United States v. Smithkline Beecham Clinical Labs.*, 245 F.3d 1048, 1052 (9th Cir. 2001), citing *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (internal quotation marks and citations omitted). However, leave to amend need not be given if the plaintiff has repeatedly failed to cure deficiencies by previous amendments or if further amendments are likely to be futile. *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990).

B. Claims under the 1934 Act

Plaintiffs assert two claims: (1) violation of Section 10(b) and Rule 10b-5 and (2) violation of Section 20(a). Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b)

\\\

4

Rule 10b-5 makes it unlawful for any person to use interstate commerce (a) To employ any device, scheme, or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

A securities fraud violation under Section 10(b) and Rule 10b-5 requires that the plaintiff allege: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused their injury." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002), *citing McCormick v. Fund Am. Cos.*, 26 F.3d 869, 875 (9th Cir. 1994).

Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. Plaintiffs claiming that individual defendants are "controlling persons" of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *See Durham v. Kelly*, 810 F.2d 1500, 1503-04 (9th Cir. 1987).

C. Private Securities Litigation Reform Act of 1995

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, requires that any complaint in a securities action plead both falsity and scienter with particularity. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1034 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(1)).

\\\

5

In addition, the complaint must "state with particularity facts giving rise to a strong inference" that the defendant acted with "intentionality or deliberate recklessness." *Ronconi*, 253 F.3d at 429 (citations omitted). The complaint "must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless[,] false or misleading nature of the statements when made." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) (citation and internal quotations omitted). Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a "strong inference" that misleading statements were made knowingly or with deliberate recklessness to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6). *Ronconi*, 253 F.3d at 429.

## DISCUSSION

### A. Request for Judicial Notice

As an initial matter, the Court addresses the Defendants' Request for Judicial Notice in Support of Motion to Dismiss Consolidated Complaint. The request asks the Court to take judicial notice of three sets of documents of the following types: (1) Analyst Reports; (2) SEC Filings; and (3) Netflix Press Releases and News Articles. In response, plaintiffs have opposed the Defendants' Request by filing a Motion to Strike Certain Exhibits Defendants Submit in Support of their Motion to Dismiss.

A court may take judicial notice of its own records, as well as documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned. *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (courts may take judicial notice of matters of public record outside the pleadings); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (courts may take judicial notice of their own records). A court may also take judicial notice of "records and reports of administrative bodies." *Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1282 (9th Cir., 1986) *(citing Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)). In addition, documents whose contents are alleged in a complaint and whose authenticity is not in question may be considered in a motion to dismiss. *See Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994).

With respect to the SEC filings that defendants submit for judicial notice (Exs. M-Q), plaintiffs contend that the Court should not take judicial notice of those filings that are not within the class period. Such SEC filings are appropriately noticed by the Court, however, to consider "whether the sales were consistent with the insider's prior trading history." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). Judicial notice for all SEC filings submitted by defendants is taken.

With respect to the Netflix Press Releases and News Articles (Exs. R-X.), plaintiffs do not oppose judicial notice, but state that the Court should consider these exhibits only for the purpose of determining what statements they contain. Defendants have only asked the Court to consider these documents for this purpose, and the Court takes judicial notice accordingly.

With respect to the Analyst Reports (Exs. A-L), plaintiffs oppose judicial notice on the basis that the analyst reports submitted by defendants are not quoted, referenced or relied upon in plaintiffs' complaint. Defendants contend that judicial notice is proper because plaintiffs' complaint is premised on allegations that information regarding Netflix's subscriber cancellations and churn formula was never disclosed, and the analyst reports demonstrate that the market was aware of such information. As an alternative basis for judicial notice, defendants argue that the Analyst Reports are a matter of public record and that their authenticity is not contested. The Court need not make a determination at this time with respect to the Analyst Reports, however, because the instant order does not rely on them.

B. Motion to Dismiss

1. False or Misleading Statements

Plaintiffs allege that defendants made misleading statements relating to four areas: subscriber retention, improved service, the impact of competitive forces, and the partnership with TIVO.

a. Subscriber Retention

Plaintiffs state that defendants overemphasized subscriber growth rate and understated subscriber churn to mislead investors as to the "true state of subscriber retention." Plaintiffs contend that defendants' statements were false and misleading because Netflix calculated churn in

7

a manner different from the manner favored by plaintiffs and because Netflix failed to disclose the number of subscriber cancellations in their financial reports for the third quarter of 2003, the fourth quarter of 2003, and the first quarter of 2004. See Exs. R, S, and T. Subscriber cancellations were expressly reported by Netflix in the second and third quarters of 2003. See Ex. U, Ex. X.

At the core of plaintiffs' case is the allegation that Netflix used an improper method of calculating "churn," a measure of subscriber retention. In Netflix's calculation of churn, the denominator consists of the sum of subscribers at the beginning of the quarter and gross subscriber additions during the quarter. In plaintiffs' preferred formula, the denominator consists the sum of subscribers at the beginning of the quarter and subscribers at the end of the quarter, divided by two. Using plaintiffs' formula to calculate churn results in churn rates that are 25% to 30% higher than the rates obtained by using the Netflix formula. For example, Netflix reported churn in the third quarter of 2003 to be 5.2%; using plaintiffs' formula, the churn rate would be 6.5%.

There is, however, no official formula for calculating churn. Plaintiffs call their method of calculating churn "actual churn," Cmplt. ¶ 34, but offer no authority for the proposition that their method is proper and Netflix's method is improper. Defendants point out and plaintiffs concede that there exists no official GAAP methodology for calculating churn. Motion at 9, Oppn. at 10. Importantly, Netflix clearly and repeatedly disclosed its formula for calculating churn. At the first mention of the term in each financial report, a footnote was included that stated "Monthly churn is defined as customer cancellations in the quarter divided by the sum of beginning subscribers and gross subscriber additions, divided by three months." See, e.g., Ex. R at 2. Given Netflix's disclosure of its method of calculating churn, Netflix's reporting of the churn rates obtained by using this formula cannot be considered to be false. *Cf. In re Calpine Corp. Securities Litigation*, 288 F. Supp 2d 1054, 1066 and 1083 (N.D. Cal. 2003) (dismissing claim that defendant's calculation of EBITDA was false and misleading because it did not comply with GAAP where GAAP did not define how to calculate EBITDA and defendants expressly and accurately disclosed how it was calculated).

1  Plaintiffs, however, contend that the Company's calculation of churn was misleading
2  because the Company did not disclose the actual number of customer cancellations in the first
3  three of its quarterly reports during the class period. Plaintiffs allege that "there was no way for
4  investors to perform the true calculation in the absence of disclosure of the number of subscriber
5  cancellations during the quarter," Cmplt. ¶ 34, and "the Company omitted to disclose the number
6  of subscriber cancellations to hinder investors in performing their own calculation of churn,"
7  Oppn. at 8.

8  The plaintiffs' argument is unavailing. Even in the financial reports in which the number
9  of subscriber cancellations was not expressly disclosed, this number could be calculated through
10 simple arithmetic using other numbers that were disclosed. More specifically, the number of
11 subscriber cancellations could be calculated by adding the number of beginning subscribers to the
12 number of new trial subscribers and subtracting the number of ending subscribers, all of which
13 were accurately disclosed in all quarterly reports during the relevant period. Similarly, plaintiffs -
14 and investors generally - could have calculated churn in the manner they preferred using the
15 numbers that were disclosed in each of the Company's quarterly reports. Because the number of
16 subscriber cancellations could be easily calculated, this allegation does not meet the required
17 standard for a false or misleading statement. *Cf. Werner v. Werner*, 267 F.3d 288, 299 (3rd Cir.
18 2001) (affirming dismissal of 10b-5 claim where "the shareholders had access to all of the
19 information necessary to calculate the exact amount of the benefit management incurred" in the
20 challenged transaction).

21 b. Improved Service

22 Plaintiffs allege that the Company made misleading statements claiming that its improved
23 service resulted in a profitable and faster growing company. For example, on October 15, 2003,
24 Hastings stated, "[o]ur quarter was stellar for one reason, consumers love our service... The better
25 our service becomes, the more profitable and faster growing our company becomes." Basing their
26 allegations on the existence of several customer complaints, plaintiffs contend that "the Company
27 was aware that its service was much worse than represented and was leading to customer
28 defections" and that the Company suffered from a "failing business model." Oppn. at 8. As

9

argued by defendants, every large company can expect to have some customer complaints, and the existence of such complaints fails to render Netflix's statements about its service false. To the extent that there were customer complaints, the Ninth Circuit's finding in *Ronconi* is applicable, "[p]roblems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements." *Ronconi*, 253 F.3d at 434. Moreover, vague and amorphous statements do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision. Raab v. General Physics Corp., 4 F.3d 286, 288-90 (4th Cir. 1990); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1246 (N.D. Cal. 1998). For these reasons, the Court finds that plaintiffs fail to plead a false statement with respect to the Company's service.

c. Impact of Competitive Forces

Plaintiffs allege that the Company downplayed the adverse impact of competitive forces. Plaintiffs cite statements by Hastings on October 15, 2003 ("On the competitive front it was another quarter of steady growth for Netflix and lack of traction for our competitors," Complaint ¶ 32) and on October 23, 2003 ("We have been competing with Blockbuster for a year, and with Wal-mart for a year. We have continued to exceed all of our growth targets," Complaint ¶ 41). The Court observes, however, that the Company was indeed gaining subscribers and increasing its revenues in this period. Also, the Company disclosed the risks that it faced from competition. In its 2003 annual report, the Company stated, "[i]f we are unable to compete effectively, our business will be affected adversely... Many of our competitors have longer operating histories, larger customer bases, greater brand recognition and significantly greater financial, marketing and other resources than we do." Ex. M at 27. The disclosure also specifically described the relevant plans of the Company's competitors. *Id.* For these reasons, the Court finds that the plaintiffs have failed to plead adequately a false statement with respect to the Company's competition.

d. Partnership with TIVO

Plaintiffs also allege that the Company misled investors by stating that, in plaintiffs' words, "the Company entered into a valuable partnership with TiVo to allow subscribers to download Netflix movies directly over the Internet in the forseeable future." Oppn. at 9. Plaintiffs state that

10

the statement was false because the Company "had no contract, no 'Memorandum of Understanding' or even a deal memo between it and TiVo that documented the logistics of a partnership." However, in the Newsweek article that plaintiffs cite for the statement, the Company actually declined to comment on the rumored partnership. Ex. V. The only statement by a defendant in this article was that of Hastings predicting that Netflix would deliver most of its movie rentals over the Net "by the end of the decade." On September 30, 2004, the Company issued a joint press release with TiVo that stated that the two companies would "work together to develop a joint entertainment offering" but did not make specific promises about how, whether, and when subscribers would be able download Netflix movies over the internet. Ex. W. For these reasons, the Court finds that plaintiffs have failed to plead a false statement with respect to the Company's partnership with TiVo.

2. Scienter

As discussed above, plaintiffs have insufficiently alleged a false or misleading statement. For the following reasons, the Court further finds that plaintiffs' allegations are deficient in establishing scienter.

a. General Allegations

Aside from allegedly suspicious stock sales, discussed below, plaintiffs offer several arguments to support their assertion that they have sufficiently pled scienter. The court observes that general allegations of defendants' positions within a company, their "hands-on" style of management, or access to internal reports do not give rise to a strong inference of scienter. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002). Similarly, merely alleging "motive and opportunity" is inadequate. *See DSAM*, 288 F.3d at 389; *Silicon Graphics*, 183 F.3d at 974.

Plaintiffs allege that scienter is supported by the fact that defendants knew the actual subscriber cancellation figures and knew that churn was a key metric. Plaintiffs further argue that calculating churn according to their formula reveals that Neflix was turning over its "entire subscriber base on an annual basis" and that the fact that defendants did not report subscriber cancellations shows that they knew that their churn rates were misleading. Finally, plaintiffs

11

contend that defendants knew about customer complaints about bad service. As discussed above, Netflix disclosed its churn rates and its formula for calculating churn, and investors could calculate the number of subscriber cancellations each quarter from other reported data. Therefore, no "strong inference" that misleading statements were made to investors knowingly or with deliberate recklessness is supported by these allegations.

b. Insider Stock Sales

The plaintiffs also rely on defendants' stock sales as a basis for showing that defendants deliberately misled investors when making the representations alleged above. Plaintiffs allege that each of the defendants made stock sales during the class period. Insider stock sales are not inherently suspicious; they become so only when the level of trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In Re Vantive Corp.*, 283 F.3d at 1092, *citing Ronconi*, 253 F.3d at 435. Among the relevant factors to consider in making this determination are: "1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history." *Id.*, *citing Ronconi*, 253 F.3d 423. "Context is important, especially for assessing the weight to attach to the timing of the sales." *Id.*

Reed Hastings ("Hastings") sold more than $12 million worth of stock, representing 7.5% of his holdings. Barry McCarthy, Jr. ("McCarthy") sold approximately $135,000 worth of stock, representing 1% of his holdings. Leslie J. Kilgore ("Kilgore") sold approximately $2 million worth of stock, representing 15.7% of her holding. Under Ninth Circuit law, these percentages are not inherently suspicious. *See In Re Vantive Corp.*, 283 F.3d at 1094; *Silicon Graphics*, 183 F.3d at 987. Moreover, both Hastings's and Kilgore's sales were pursuant to a Rule 10b-5(1) trading plan and were consistent with their prior trading histories. *See Howard v Everex Sys. Inc.*, 228 F.3d 1057, 1066 (9th Cir. 2000). Beginning in February 2003 and continuing until July 2004, Hastings sold 10,000 shares per week. The evidence also shows that Kilgore sold over three times as many shares during the 10 months before the class period as she did during the class period. For all of these reasons, the stock sales of the defendants do not support a strong inference of scienter.

\\\

### 3. Control Person Claim

Because plaintiffs have failed to plead an underlying securities law violation with respect to claims dismissed thus far, plaintiffs' control person claim under § 20(a) must also be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Consolidated Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is GRANTED. The Court has serious reservations as to whether plaintiffs' allegations regarding churn and cancellations, improved service, competition, and TiVo can be successfully resurrected. Despite this, plaintiffs are granted leave to amend, within 30 days of this Order, the entire complaint. The hearing scheduled for July 7, 2005 is VACATED.

**IT IS SO ORDERED.**

Nunc pro tunc
Dated: June 23, 2005

FERN M. SMITH
UNITED STATES DISTRICT JUDGE