IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NETFLIX, INC. SECURITIES LITIGATION | No. C 04-2978 WHA <br><br> <u>Consolidated Cases</u> <br> C 04-3021   C 04-3329 <br> C 04-3204   C 04-3770 <br> C 04-3233   C 04-3801 <br><br> <u>CLASS ACTION</u> <br><br> **DISMISSAL ORDER** |

## INTRODUCTION

In this securities-fraud case, defendants move for dismissal of plaintiffs' first amended consolidated complaint (hereinafter "complaint") and for judicial notice of certain documents. The request for judicial notice is unopposed and is **GRANTED**. Because plaintiffs have failed to allege any false statements or material omissions, the motion to dismiss for failure to state a claim is **GRANTED**. Leave to amend previously being allowed, the case is over at the district court. This time the dismissal is without leave to amend.

## STATEMENT

Lead plaintiffs are four investors who purchased publicly traded shares of securities in Netflix, Inc., a corporation based in Los Gatos, California, that sold monthly subscriptions allowing people to order DVDs on the Internet and to receive them by mail.

They allege that they purchased shares at prices that were inflated by fraud committed by Netflix and three of its officers: Reed Hastings, chief executive officer and board of

1  directors chairman, Barry McCarthy, chief financial officer and secretary, and Leslie Kilgore,
2  chief marketing officer and marketing vice president.
3     Lead plaintiffs claim that from April 17, 2003, to October 14, 2004, defendants made
4  false and misleading statements, and failed to disclose material facts required to make their
5  other statements not misleading.  They allege such statements came in press releases issued on
6  wire services, in Securities and Exchange Commission filings, in public presentations and in
7  telephone conference calls with investors and analysts.  They charge defendants with using a
8  misleading calculation of the average subscriber cancellation rate, also called "churn."  That
9  metric was in turn used to calculate other financial measures.  Plaintiffs allege that investors
10 relied upon these measures in overvaluing the securities.  Defendants do not contest that the
11 measures are material.  The contested measures made Netflix appear to be viable.  In fact, say
12 plaintiffs, the company's business model was broken.

13     **1.    JUDICIAL NOTICE.**
14     Defendants have asked for judicial notice of certain SEC filings, calculations based upon
15 information in those filings, Netflix press releases and a publication on churn published by the
16 audit firm KPMG and referenced in the complaint (Defs.' Req. for Judicial Notice).
17     A court must take judicial notice of adjudicative facts if a party requests that it do so,
18 supplies the necessary information to decide the request and the facts are "not subject to
19 reasonable dispute" because they are "capable of accurate and ready determination by resort to
20 sources whose accuracy cannot reasonably be questioned."  FRE 201 (a), (b), (d).
21     The time has passed for plaintiffs to raise objections to defendants' request.  They have
22 not done so.  Defendants have met the FRE 201 requirements.  The documents are relevant to
23 the complaint.  This order therefore takes notice of those facts.

24     **2.    PUBLIC STATEMENTS BEFORE THE CLASS PERIOD.**
25     As Netflix was preparing to make its initial public offering of securities, it notified the
26 SEC on April 16, 2002, that "an average of approximately 8% of [] total subscribers cancelled
27 their subscriptions each month" in the twelve-month period that had ended March 21.  It
28 repeated that statement to the SEC on May 6.  Two weeks later, the company reported a similar

1  cancellation rate for calendar year 2001. It further stated that for the first quarter of 2002, the
2  cancellation rate per month was about seven percent, down from about ten percent in the first
3  quarter of 2001. Netflix repeated most of these statements in its IPO Prospectus filed May 23,
4  2002 (Compl. ¶¶ 92, 94, 95). In these statements, the corporation provided no definition of
5  "total subscribers."

6  On July 24, 2002, the company released a statement that churn had declined to 6.7
7  percent. In an endnote linked to the first mention of churn, the term was defined as "a monthly
8  percentage determined by subtracting from one, a quotient, the numerator of which is the
9  ending subscribers for the current quarter and the denominator of which is the sum of the
10 previous quarter's ending subscribers plus the current quarter's new trial subscribers and then
11 dividing this resulting number by 3, which is the number of months in the quarter." That
12 formula was repeated in the corporation's quarterly SEC filings for the second and third
13 quarters of 2002 (Hoffman Decl., Exhs. A, B, G).

14     **3.     ALLEGED FRAUD DURING THE CLASS PERIOD.**

15 The first allegedly false statement made during the class period came April 17, 2003,
16 when the company announced that its first quarter 2003 churn rate was a "record low" of 5.8
17 percent, down from 7.2 percent a year earlier (Hoffman Decl., Exh. H). The release also stated
18 that "implied subscriber lifetime" — the average duration of subscriptions — was defined as the
19 inverse of the reported churn rate.* The release's tabular material containing the churn rate
20 purportedly was "unaccompanied by, and was not preceded by, any definition of how the churn
21 rate was calculated" (Compl. ¶¶ 104–05). That claim is untenable. The July 24, 2002, press
22 release and the quarterly reports for the second and third quarters of 2002 each disclosed how
23 churn was determined. This order takes judicial notice of those documents.

24 Also on April 17, Hastings and McCarthy spoke by conference call with analysts.
25 Hastings touted the company's "lowest churn rate in [its] history," repeated the churn statistics
26 for the quarter, stated that the decrease was related to improving customer satisfaction and

---

* For example, if the churn rate per month were 0.05, then the "average subscriber lifetime" would be 1/0.05 months = 20 months (Compl., App. A at 3).

3

credited the low churn rate with playing a central role in "enabling [Netflix] to build a bigger and more profitable business." He also stated that customer retention "is the just the numeric inverse on churn." McCarthy stated that the churn rate was one of the "trinity of metrics" guiding Netflix to financial success (Compl. ¶ 106).

This news propelled average share price twenty percent higher over the next two days, to $24.63, on volume five times its normal level (Compl. ¶ 112).

Hastings repeated the churn-rate figures in a public presentation at the Wharton School of Business at the University of Pennsylvania on May 1, 2003, and three days later by Netflix in its first-quarter SEC report. Tabular material in that filing included a line listing the churn rate followed, on the next line, by the average number of paid subscribers during the quarter. The latter line was indented so that it appeared to be a sub-component of the churn rate. No definition of churn was given (Compl. ¶¶ 115, 117).

On July 17, 2003, Netflix announced that its churn rate was 5.6 percent in the second quarter. The term "churn" was followed by a superscript numeral that led readers to an endnote definition identical to earlier ones. Again, Hastings and McCarthy spoke by conference call with analysts and touted the importance of declining churn (Compl. ¶¶ 119, 120, 122).

On October 15, 2003, Netflix announced another churn-rate decline, to 5.2 percent, and again defined the term. This time, it was defined "as customer cancellations in the quarter divided by the sum of beginning subscribers and gross subscriber additions, divided by three months." This definition is functionally identical to the more formal one given earlier. Hastings and McCarthy hailed the results in a quarterly conference call. Hastings said good service drove churn down. McCarthy called churn a "primary driver[]" of financial performance," and partly attributed its decline to an increase in the number of movies Netflix's offered for rental (Compl. ¶¶ 124, 126).

In an interview October 23, 2003, Hastings was asked by The Motley Fool magazine how long the "median customer is maintaining his Netflix membership?" Hastings responded by stating that the "mean customer life" was "roughly one divided by the churn," a definition identical to that previously applied to "implied subscriber lifetime" (Compl. ¶ 129).

4

On January 21, 2004, the company announced the churn had fallen to 4.8 percent in the fourth quarter of 2003. It repeated the definition of churn (Hoffman Decl., Exh. J). This achievement was trumpeted in a conference call to analysts. On March 1, the company repeated these results and the churn definition in SEC filings. It ascribed the lower rate to an increase in the proportion of longer term subscribers to new subscribers, and to service improvements (Compl. ¶¶ 138–39, 143).

On March 29, the stock price bounced almost ten percent, to $31.87 per share (Compl. ¶ 145).

On April 15, 2004, Netflix released another quarter's results. "Record low churn" was at 4.7 percent. Netflix again defined the term. At the same time, however, it raised monthly subscriptions from $19.95 to $21.99 (Compl. ¶ 146). That same day, Hastings told analysts that the churn rate was Netflix's best indicator of customer satisfaction, and predicted that it would dip below four percent in 2005 (Compl. ¶¶ 146–47).

The following day, Netflix's share price stumbled, falling $6.27, to $30.75. In a television interview that day, Hastings predicted that churn would increase slightly in the next quarter, followed by a steep drop. On May 3, 2004, Netflix reported these results to the SEC (Compl. ¶¶ 150–52).

On July 15, 2004, Netflix released second-quarter results. Churn had sprung up to 5.6 percent. Netflix directly disclosed the number of customer cancellations in the second quarter of 2003, and the first two quarters of 2004. Investors had previously been able determine such figures only by algebraic equation. Share price tanked after this announcement, falling from $32 to $20 over the next two days (Compl. ¶¶ 158, 160). The 5.6 percent churn figure was reported to the SEC on July 30.

On October 14, 2004, the last day of the class period, Netflix announced that it was delaying plans to expand into the United Kingdom, downgraded its earnings forecast from $80 million to zero and retreated from its higher prices, dropping basic service to $17.99 per month. Churn had stayed at 5.6 percent in the previous quarter. Netflix defined the term yet again. On

5

1  October 15, 2004, Netflix stock cratered, falling to $10.30 per share and losing forty-one
2  percent of its value.

3      **4.    PROCEDURAL HISTORY.**

4      The first securities-fraud action in this case was filed July 22, 2004.  A consolidated
5  complaint came six months later.  Judge Fern Smith dismissed that complaint June 23 for failure
6  to state a claim, ruling that Netflix's churn rate was not false and that investors were able to
7  calculate the rates preferred by plaintiffs using numbers Netflix provided during the class
8  period.  She also stated that plaintiffs had not alleged a strong inference of scienter.  The
9  complaint was dismissed with leave to amend (Order Granting Defendants' Mot. To Dismiss
10 8–9, 11–12, 13, hereinafter "Smith Order").  A new, amended complaint was filed entitled
11 "First Amended Consolidated Complaint."  Defendants responded with the instant motion to
12 dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

13                          **ANALYSIS**

14     Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is
15 unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any
16 manipulative or deceptive device or contrivance in contravention of such rules and regulations
17 as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. 78j(b).

18     SEC Rule 10b-5 bars any person from using interstate commerce to (1) employ "any
19 device, scheme, or artifice to defraud, (2) make any untrue statement of a material fact or to
20 omit to state a material fact necessary in order to make the statements made, in light of the
21 circumstances under which they were made, not misleading, or (3) to engage in any act,
22 practice, or course of business which operates or would operate as a fraud or deceit upon any
23 person, in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5.

24     A party can only be held liable under Section 10(b) and Rule 10b-5 for a false statement
25 or omission if there is "(1) a misstatement or omission (2) of material fact (3) made with
26 scienter (4) on which [plaintiffs] relied (5) which proximately caused their injury." *DSAM*
27 *Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002).

28

Section 20(a) of the Securities Exchange Act of 1934 allows imposition of joint and several liability on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. 78t(a). Plaintiffs claiming that someone is a "controlling person" must allege that (1) he or she had the power to control or influence the company, (2) he or she was a culpable participant in the allegedly illegal activity, and (3) the company violated federal securities laws. *See Durham v. Kelly*, 810 F.2d 1500, 1503–04 (9th Cir. 1987).

Securities-fraud plaintiffs must meet demanding pleading requirements. The Private Securities Litigation Reform Act requires them to specify each misleading statement, why the statement was misleading and, if an allegation is made on information and belief, all facts upon which that belief is formed. 15 U.S.C. 78u-4(b)(1). The complaint must also state with particularity facts giving rise to a "strong inference" that the defendant knowingly or with deliberate recklessness made false statements or omitted a material fact. 15 U.S.C. 78u-4(b)(2); *In re Silicon Graphics Securities Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).

These PSLRA requirements are in "inevitable tension [with] . . . the customary latitude granted the plaintiff on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). In considering whether to dismiss a securities-fraud claim, a court is not required to draw all reasonable inferences in the plaintiffs' favor, as it is for most 12(b)(6) motions. *See Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987) (stating 12(b)(6) standard). The court instead must consider *all* reasonable inferences, whether unfavorable or favorable to the plaintiffs. *Gompper*, 298 F.3d at 896. The court is not required, however, "to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). Rule 12(b)(6) requires dismissal when it appears beyond doubt that plaintiff can prove no set of facts to support a claim entitling him to relief under a cognizable legal theory. *Conley v. Gibson*, 355 U.S. 41, 46 (1957); *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). When the claim alleges false statements and is subject to the PSLRA, it must appear beyond doubt that plaintiff cannot prove a strong inference that

defendants knowingly made false statements, or made them with reckless disregard for the truth.

### 1. PLAINTIFFS' ALLEGATIONS.

Plaintiffs claim that defendants' statements about churn, and defendants' failure to provide certain other information related to churn, were false or misleading for several reasons.

First, plaintiffs claim defendants did not disclose that Netflix's churn calculation and derivative financial measures were "inaccurate . . . illogical . . . and . . . unconventional." Instead, defendants allegedly led investors to believe that the churn rate was one of the more commonly used methods discussed below. The measures derived from the churn rate were the average duration of subscriptions ("average subscriber lifetime") and the average amount of money earned per subscriber ("subscriber lifetime value," equivalent to the "average subscriber lifetime" in months multiplied by the average monthly subscription cost) (Compl. ¶¶ 24, 107).

Second, Hastings attributed the decrease in churn to Netflix's "strategic focus on improving the Netflix user experience." He thus drew an allegedly false causal connection between increased customer satisfaction and lower churn, when in fact the lower churn was due in part to Netflix's unique method of computing churn (Compl. ¶ 108).

Third, defendants computed "average subscriber lifetime" as the inverse of the reported churn rate. Plaintiffs claim that this was false because the usual measure of "average subscriber lifetime" bears no such relationship to Netflix's method. In drawing the analogy between the two rates here, defendants allegedly misled the market into believing that its financial measures were identical to those commonly used by other subscription businesses (Compl. ¶ 110). Furthermore, plaintiffs allege that although the inverse of its "true churn" rate (described below) is a fair estimate of "average subscriber lifetime", the inverse of Netflix's churn rate is a less accurate estimate, and thus misled investors (Compl. App. A at 14).

Fourth, defendants used "average subscriber lifetime" to calculate revenue, operating income, and earnings before interest, taxes, depreciation and amortization (EBITDA). Plaintiffs reason that, because the "average subscriber lifetime" figure was misleading, these further measures based on it were also misleading (Compl. ¶ 111).

Fifth, plaintiffs allege that defendants "buried" their churn definition in press releases and SEC filings, and sometimes obscured it by not stating it in "plain-English" (Compl. ¶ 121).

In short, "having cleverly redefined commonly-understood financial measures [defendants] nevertheless stated and discussed those measures in a manner designed to suggest that their definitions accorded with the commonly-understood definitions" (Compl. ¶ 118).

Plaintiffs assert that defendants should have calculated churn in one of two ways:

1. The number of cancellations in the month divided by the number of subscribers at the month's start. This is the method described by KPMG.
2. The number of cancellations in the month divided by the average number of subscribers at any one point during the month. Plaintiffs call this "true churn."

Instead, Netflix determined monthly churn as the number of cancellations during the quarter divided by the sum of subscribers at the beginning of the month and gross subscriber additions, with the result divided by three.

Plaintiffs assert that their preferred methods are the industry standards. They claim that Netflix's redefinition of those terms was false and misleading because the new churn calculation did not reasonably express the relative propensity of subscribers to terminate their service. They also claim that Netflix's failure to disclose the proper rates was a material omission that made its other statements misleading (Compl. ¶¶ 49, 70, 161, 201; Opp. 4). Plaintiffs concede that there is no generally accepted accounting principle (GAAP) for churn rates (*see, e.g.*, Compl ¶ 3).

In addition, plaintiffs allege that Netflix's calculation yielded lower (*i.e.*, better) churn rates than did the "true churn" method, and thus created a false impression of success. During the class period, the Netflix method produced rates that were 1.94 percentage points to 1.19 percentage points lower than "true churn." These differences produced a discrepancy in "average subscriber lifetimes" between the two methods. The "average subscriber lifetime" calculated using Netflix's churn rate was 3.6 months to 5.1 months longer (*i.e.*, better) than that derived from "true churn." For example, it was 21.4 months under the Netflix method and 16.3

9

months under "true churn" during the first quarter of 2004. The degree by which the Netflix method produced a lower churn rate increased in periods when the company added many new subscribers. This was significant because, during the class period, Netflix was acquiring as many as 760,000 new subscribers per quarter (compared with 1.5 million at the beginning of that particular period). Furthermore, during one quarter of the class period, the Netflix method produced a decline in the churn rate while the "true churn" method above produced an increase (Compl. ¶¶ 46, 60, App. B).

Plaintiffs also claim that defendants "never once gave notice to investors that their reported measures of 'average subscriber lifetime' and subscriber lifetime value were derived from their novel 'churn rate.'" This, however, is contradicted within the complaint, where plaintiffs reproduce a table in Netflix's April 17, 2003, press release, defining "implied subscriber lifetime (months)" as the "reciprocal of *reported* churn" and, in turn, describing the calculation method for implied lifetime revenue as "implied subscriber life multiplied by monthly subscription charge" (Compl. ¶¶ 80, 105; Hoffman Decl., Exh. H at 9) (emphasis added).

Plaintiffs claim that despite using a novel churn-rate method, defendants discussed it and its derivative measures as if they were the calculations commonly used in the industry. They note several examples.

1.  Netflix's Form 10-Q report to the SEC for the first quarter of 2003 included a line of tabular data for "[a]verage paid subscribers during period" immediately below a line on "[s]ubscriber churn (monthly)." This lower line was indented, as if it were a sub-component of subscriber churn (*see* Compl. ¶ 117). It looked like this:

|  | Three months ended | |
|---|---|---|
|  | March 31, 2002 | March 31, 2003 |
| Subscriber churn (monthly) | 7.2% | 5.8% |
| Average paid subscribers during period | 481 | 903 |
| Average paid subscribers year to year change | 78% | 88% |

In fact, the *average* number of paid subscribers was not an input to the churn calculation. That calculation depended instead on the number of subscribers at the beginning of the quarter, plus gross additions during the quarter.

10

2. Although defendants knew the mean duration of a subscription, they instead presented the inverse of the churn rate as the "average subscriber lifetime" in conversations with analysts, as on April 17, 2003 (Compl. ¶ 110).

3. When apparently discussing churn, Hastings talked about "retention" going to an all-time high, thus allegedly invoking the more common definition of that term as the inverse of the "true churn" rate. McCarthy did the same (Compl. ¶¶ 125, 139).

4. When discussing the churn rate during the third quarter of 2003 in a call with analysts, Hastings described the significance of the quarter's decline in churn from 5.6 percent to 5.2 percent. He stated: "[P]lus or minus . . . 0.2 [percentage points] is statistical noise. . . . [Y]ou're talking about 3,000 or 4,000 people out of 1.3 million staying or not staying gets you 0.2 [percentage point differences in the churn rate]. So factoring that in, it still is a statistically significant difference going from 5.6 [percent churn] to 5.2 [percent churn]." At the end of the third quarter of 2003, 1.3 million subscribers remained with Netflix. That figure, however, was not an input in Netflix's churn calculation. Plaintiffs claim Hastings nevertheless was discussing the figure so as to suggest subtly that Netflix's churn calculation was based in part that 1.3-million figure, as the "true churn" rate would have been (Compl. ¶¶ 126).

5. An interviewer apparently misunderstood how Netflix calculated the churn rate yet Hastings did not correct him (Compl. ¶¶ 126, 130–31).

In addition to alleging that Netflix's statements were false, plaintiffs also allege that defendants' purported decision to deceive investors was an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security," barred by 17 C.F.R. 240.10b-5.

All analysts covering Netflix during the class period appear to have adopted defendants' churn rates in making their own calculations of "average subscriber lifetime" and average subscriber lifetime values (Compl. ¶¶ 82, 83, 133).

**2.    NO FALSE STATEMENT, MATERIAL OMISSION OR FRAUDULENT PRACTICE**

At the beginning of the class period, defendants' definition of churn already had been properly disclosed (*see* Hoffman Decl., Exhs. A (second quarter 2002 SEC report), B (third

11

1  quarter 2002 SEC report) and G (July 24, 2002, press release)). This definition was repeated
2  during the class period on July 17, 2003 (Netflix press release), October 15, 2003 (press
3  release), January 21, 2004 (press release), March 1, 2004 (SEC fourth quarter 2003 results),
4  April 15, 2004 (press release), July 30, 2004 (SEC filing) and October 14, 2004 (press release).
5  In short, it was reported every quarter. Given Netflix's regular disclosure of the calculation
6  method in its nationally distributed press releases and in SEC filings, defendants cannot be said
7  to have failed to disclose this material information.

8  Furthermore, the raw data that would have allowed investors and analysts to calculate
9  churn using the methods preferred by plaintiffs were disclosed by Netflix (*e.g.*, Hoffman Decl.
10 Exhs. J, K (containing number of subscribers at beginning and at end of first quarter 2004, and
11 new subscribers acquired during period)). *See Werner v. Werner*, 267 F.3d 288, 299 (3d Cir.
12 2001) (affirming dismissal of 10b-5 claim where "the shareholders had access to all the
13 information necessary to calculate the exact amount of the benefit management incurred" in the
14 challenged transaction.); *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323 (7th Cir.
15 1988) (no fraud where defendant disclosed the relevant numbers and the necessary calculation
16 to produce the ratio at issue).

17 Plaintiffs do not allege that defendants' used bogus figures to calculate the Netflix churn
18 rate nor that the calculations were done improperly. Their complaint is that *other*, more
19 common methods would have been more predictive, descriptive and consistent. They claim that
20 the other methods are so superior and the Netflix methods so deeply flawed that using them
21 amounts to fraud.

22 This is not a case in which defendants used one calculation method when another is
23 mandated by industry practice, generally accepted accounting principles or federal securities
24 regulations. As noted above, plaintiffs concede that there is no GAAP for churn rates.
25 Plaintiffs themselves suggest that no method is generally accepted as superior, citing a study
26 that found that, among the companies taking in ninety percent of U.S. wireless telephone
27 revenue, forty-one percent of them used the KPMG formula and fifty-nine percent used the
28

1  "true churn" method (Compl. ¶ 50).  Plaintiffs cite no statute or SEC regulation barring Netflix
2  from reporting its type of churn rates.
3       It is true, of course, that a public release, filing or prospectus can be misleading even
4  though every sentence therein is literally true.  *SEC v. C.R. Richmond & Co.*, 565 F.2d 1101,
5  1106–07 (9th Cir. 1977).  But here the critical key to understanding defendants' methodology
6  was adequately and repeatedly disclosed.  They did not need to repeat this information in
7  telephone calls with analysts because the information already was available in press releases
8  and filings with the SEC.
9       The company's Form 10-Q for the first quarter of 2003 could have been indented
10 differently to reflect more clearly the independence of subscriber churn rates and the number of
11 average paid subscribers during the period.  The failure to be that clear does not rise, however,
12 to the level of being false and misleading.  No reasonable investor would have concluded that
13 Netflix's churn rate was dependent on the average number of *paid* subscribers because a major
14 and prominent part of Netflix's business was *free* trial subscriptions (*see* Compl. ¶ 31).
15 Defendants prominently disclosed that churn included free trial subscriptions (Netflix press
16 release, April 17, 2003, Hoffman Decl., Exh. H at 1, ¶ 3 ("Churn includes free trial subscribers
17 as well as paying subscribers who elect not to renew their monthly subscription service during
18 the quarter."); *see also* Compl. ¶ 104 (quoting from release)).
19       Defendants did not estimate mean subscription length in the most common way, by the
20 inverse of one of the more common churn rates.  Instead, they used the inverse of the Netflix-
21 calculated churn rate.  The use of a unique measure in and of itself does not render their reports
22 false and misleading.  Plaintiffs claim that such unique definitions are false and misleading
23 because "[a]verage subscriber lifetime . . . ha[s][] a plain-English meaning" that is different
24 from the inverse of  Netflix's churn rate (Compl. ¶ 79).  Not so.  There are no plain-English
25 definitions of these financial measures.  They are, like all statistics, artificial *constructs*.
26 Emphasis is placed on the word "constructs" because it signifies that the financial terms are
27 built and therefore defined by their builders.  In this situation, Netflix was the builder of the
28 financial measure "average subscriber lifetime" and it fully disclosed what it had built by

United States District Court
For the Northern District of California

13

defining the term in its many public statements. It therefore made no false statement. If anyone ever thought that the measure was more accurate than it actually was, it was not because defendants made any false or misleading statement.

Hastings's and McCarthy's discussions of "retention" did not suggest the more traditional churn methodology in light of the fact that they repeatedly and clearly explained that their own method of determining retention. Confusion over Hastings's remarks concerning the churn attributable to 1.3 million people is possible but too uncertain to form the basis of any jury finding that such a statement was false. Failure to correct an interviewer's false statement is not a false statement in itself. Hastings had no duty to police the media.

Plaintiffs' allegations fail insofar as they allege that defendants' made a decision to deceive investors and that such a decision constitutes an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security," 17 C.F.R. 240.10b-5. Any decision to deceive is a scienter allegation, not one of an act, practice, or course of business that operates as a fraud. This allegation therefore fails.

**3.    NO VIOLATION OF REGULATIONS G, S-K OR S-B, OR OF ITEM 12, FORM 8-K**

Plaintiffs allege that defendants violated SEC regulations G, S-K and S-B, and rules governing Item 12 of Form 8-K (Compl. ¶¶ 189–90). Regulation G bars securities issuers from disclosing a non-GAAP financial measure that, taken together with accompanying information and discussion, is untrue or omits to state a material fact necessary to make that presentation not misleading. 17 C.F.R. 244.100(b). Netflix's churn rate and related measures were not prepared in accordance with generally accepted accounting principles because there is no GAAP for such measures. As stated above, the information was not untrue nor did it omit to state a material fact. Netflix, therefore, did not violate this aspect of Regulation G.

Regulation G also requires issuers who disclose non-GAAP information to produce the "most directly comparable" GAAP measure and reconcile it with the non-GAAP measures. 17 C.F.R. 244.100(a). Plaintiffs accuse defendants of misleading investors by using Netflix's churn rate and its inverse, "average subscriber lifetime," to calculate EBITDA (Compl. ¶ 111).

14

1  Defendants reconciled EBITDA with earnings calculated according to GAAP, adding back in
2  stock-based compensation, depreciation and amortization (Hoffman Decl., Exh. H at 9–10).
3  Plaintiffs claim that this reconciliation violated Regulation G because its EBITDA figure was
4  distorted by the inclusion of the allegedly misleading churn rate and "average subscriber
5  lifetime" figure (*ibid.*, Opp. at 13–14). There was nothing misleading about the reconciliation.
6  It contained explicit definitions of churn and average subscriber lifetime and made it clear that
7  EBITDA incorporated those figures (Hoffman Decl., Exh. H at 9–10). In short, all the inputs
8  into this reconciliation were fully and clearly disclosed. Defendants did not violate Regulation
9  G.

10  Plaintiffs allege that defendants violated Regulation S-K, Item 10, which requires an
11  issuer disclosing non-GAAP information to state why that information is useful to investors. 17
12  C.F.R. 229.10(e)(1)(i)(C). Plaintiffs concede, however, that such disclosure was made. They
13  claim that there nevertheless was a violation of Regulation S-K because that information
14  allegedly furthered defendants' fraud (Compl. ¶ 192). This claim is unavailing because, as
15  discussed above, there was no false statement or material omission. Plaintiffs allege that
16  Netflix also violated an almost identical requirement under Regulation S-B, Item 10, that is
17  applicable only to small-business securities issuers. 17 C.F.R. 228.10(h)(1)(i)(C). Netflix was
18  not subject to Regulation S-B because it was not a small-business issuer during the class period.
19  *See* 17 C.F.R. 228.10(a)(1)(i) (defining small-business issuer as one with $25 million or less in
20  annual revenues); *see also, e.g.*, Compl. ¶ 119 (listing quarterly revenues of $63 million).
21  Netflix therefore could not have violated Regulation S-B, Item 10.

22  Plaintiffs also allege that defendants violated disclosure rules related to Item 12 of Form
23  8-K. Plaintiffs concede, however, that defendants were *exempt* from the disclosure
24  requirements of Item 12 because they disclosed the relevant information on the Netflix web site.
25  They claim, however, that defendants removed the material from the web site too early. The
26  only authority they cite for a requirement to maintain the information for a minimum period of
27  time is an SEC statement that actually states that there is *no* such minimum period: "Item 12
28  does not state how long a company must keep this information available on its web site." The

15

1  SEC statement expresses mere "encouragement" to companies to keep it up for twelve months.
2  Plaintiffs therefore allege only that Netflix acted contrary to SEC guidance (Compl. ¶¶ 193–95).
3  This is not sufficient to allege a violation of Section 10(b).

**4.  NO CONTROL PERSON LIABILITY.**

No Section 20(a) claim can stand without an underlying violation by the company of securities laws. In this case, there was none. The Section 20(a) claim of control-person liability is therefore dismissed.

**CONCLUSION**

Because no defendant made a false statement actionable under federal securities law, plaintiffs have failed to state a valid claim and there is no need to consider other elements of a valid 10(b) claim, such as scienter. The complaint is **DISMISSED WITHOUT LEAVE TO AMEND** for the reasons stated above. The Clerk is directed to close the case.

**IT IS SO ORDERED.**

Dated: November 18, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE